IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| EAST WEST, LLC d/b/a CARIBBEAN CRESCENT, <br><br>   Plaintiff, <br><br>   v. <br><br> SHAH RAHMAN, <br><br> and <br><br> CARIBBEAN CRESCENT, INC. <br><br>   Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) 1:11cv1380 (JCC/TCB) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| CARIBBEAN CRESCENT, INC., <br><br>   Counterclaimant and Third-Party Plaintiff, <br><br>   v. <br><br> EAST WEST, LLC, d/b/a CARIBBEAN CRESCENT, <br><br>   Counter-Defendant, <br><br> and <br><br> NAEEM ZAI, <br><br> and <br><br> MOHAMMED SADIQ, <br><br>   Third-Party Defendants. | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Plaintiff's Motion to Strike the August 16, 2012 "Supplemental" Expert Report of Defedants' Expert Jonathan A. Cunitz [Dkt. 141] (the "Motion"). For the following reasons, this Court will grant the Motion.

### I. Background

A. <u>Factual Background</u>

Plaintiff East West, LLC ("East West") sells food products including Jamaican and south Asian spices and halal meat and fish in the Washington, D.C. metropolitan area and surrounding communities. (Supplemental Amended Complaint ("SAC") [Dkt. 59] ¶ 2.) On June 11, 2003, East West and Third Party Defendants Naeem Zai and Mohammad Sadiq, who are East West's President and Vice President, respectively, (collectively, the "Buyers") entered into an "Agreement for Sale of Inventory/Assets" (the "Sale Agreement") with Defendants in which they agreed to purchase the business assets known as Caribbean Crescent. (SAC ¶ 13; Ex. A ("Sale Agreement") at 1.) Defendants agreed to deliver to the Buyers all rights, title, and interest in the business assets known as Caribbean Crescent including the common law trademark CARIBBEAN CRESCENT ("the CARIBBEAN CRESCENT Mark" or "the Mark") and the trade name Caribbean Crescent. (SAC ¶¶ 17-18, 21; Sale Agreement § 1.)

The Sale Agreement contained a non-compete provision (the "Non-Compete Agreement"), in which Defendants agreed not to compete with the business being sold to the Buyers for a period of five years and within a five mile radius of the Washington Metropolitan Area. (Sale Agreement § 21.) Defendants were entitled to "use [the] Carribean Crescent [as opposed to Caribbean Crescent] trade name," and to "continue [to] trade and market products and services as Carribean Crescent [as opposed to Caribbean Crescent] outside the Washington Metropolitan Area." (Id.)

On June 17, 2003, the parties closed on the Sale Agreement. (SAC ¶ 34.) The Buyers purchased the business assets known as Caribbean Crescent as well as Defendants' remaining inventory of goods. (SAC ¶¶ 31, 36.) The Buyers paid $225,918 and executed a promissory note in the amount of $215,918 in furtherance of the Sale Agreement. (SAC ¶ 40; Settlement Agreement.) The Buyers satisfied the amount due under the promissory note over a period of approximately two and a half years. (SAC ¶ 47.)

The parties executed an Articles of Sale and Transfer, also on June 17, 2003, in which CCI transferred all of the assets of Caribbean Crescent, including the trade name Caribbean Crescent and the CARIBBEAN CRESCENT Mark to East West. (SAC ¶ 44; Ex. D.) That same day, the parties entered into a Financing Statement in which CCI was the Secured Party and Buyers were the

Debtor, and which covered all "Goodwill, the tradename 'CARRIBEAN CRESCENT' [sic] and all derivatives thereof; customer lists; and telephone numbers." (SAC ¶ 45; Ex. E.) The Buyers thereupon began using the trade name Caribbean Crescent and the CARIBBEAN CRESCENT Mark, and East West began doing business as Caribbean Crescent. (SAC ¶¶ 48-50.)

On February 23, 2004, East West and CCI entered into a Commission Agreement, which provided that East West would handle all sales of Defendants' Jamaican patties product in the Washington Metro Area. (SAC ¶¶ 55-56; Ex. I.) East West was entitled to a twenty percent commission for such sales. (Id.) The Commission Agreement also established a five percent commission to be paid by East West to CCI for all sales of East West's products made by Rahman. (SAC ¶ 57.) East West alleges that Defendants have never paid any commissions on any of the sales made pursuant to the Commission Agreement. (SAC ¶ 59.)

Defendants allegedly violated the Non-Compete Agreement and the sale and assignment of the trade name Caribbean Crescent by competing against East West and using the trade name Caribbean Crescent within a five-mile radius of the Washington Metro Area "sometime between June 17, 2003 and June 16, 2008." (SAC ¶¶ 60, 62.) Defendants also allegedly began using the CARIBBEAN CRESCENT Mark "sometime shortly after" the sale and assignment of the Mark to East West. (SAC ¶ 64.) East West alleges, on

information and belief, that a number of the products sold by Defendants under the trade name Caribbean Crescent and bearing the CARIBBEAN CRESCENT Mark were first introduced into the market in June or July of 2011.  (SAC ¶¶ 61, 63.)

On or about February 20, 2008, Defendants allegedly filed a trademark application with the United States Patent and Trademark Office for the CARIBBEAN CRESCENT Mark, despite having sold and assigned the Mark to East West over four years earlier. (SAC ¶¶ 65-66.)  Defendants allegedly made various fraudulent statements regarding their purported ownership and use of the CARIBBEAN CRESCENT Mark in filing and prosecuting the trademark application.  (SAC ¶¶ 66-70.)  The PTO ultimately accepted the trademark application and registered the CARIBBEAN CRESCENT Mark.  (SAC ¶ 79.)

On or about October 30, 2008, Rahman sent a facsimile to East West claiming ownership of the CARIBBEAN CRESCENT Mark. (SAC ¶ 71.)  Rahman sent two subsequent facsimiles to East West in which he expressed a desire to clear up their misunderstandings.  (SAC ¶¶ 72-73; Exs. N, O.)  On December 15, 2008, East West sent a letter by counsel to Rahman asserting that it had purchased all of CCI's assets, including the trade name Caribbean Crescent.  (SAC ¶ 74; Ex. P.)

In January 2009, Rahman advised Zai that Rahman's father, who was terminally ill with cancer, wished to meet with him to

help resolve the problems between the parties. (SAC ¶ 75.) In February 2009, Sadiq and Zai visited Rahman's father. (SAC ¶ 77.) Rahman was also present. (*Id.*) At that time, Rahman's father allegedly stated that Rahman had not honored the agreements between the parties but that he would from that point on. (*Id.*) Rahman himself allegedly agreed to honor the parties' agreements as well. (*Id.*)

In February or March of 2011, Defendants hired a former employee of East West named Ishmael Amin. (SAC ¶ 82.) According to East West, Amin had knowledge of its customers, its business methods, and "other 'company sensitive' information." (*Id.*) Much of this information was valuable, not known outside of its business, was protected, and would be difficult, if not impossible, for Defendants to acquire or duplicate. (SAC ¶ 83.) Defendants have allegedly obtained proprietary information and knowledge of East West's business relationships through Amin. (SAC ¶¶ 85, 88.) East West alleges that Defendants have begun to interfere with East West's business relationships and to use its proprietary information. (SAC ¶¶ 86-87.)

In June or July of 2011, Rahman approached Zai and Sadiq with new products displaying the trade name Caribbean Crescent and the CARIBBEAN CRESCENT Mark and asked if East West would sell those products in the Washington Metropolitan Area. (SAC ¶ 80.) When Zai and Sadiq refused, Rahman informed them that he

would proceed to sell the products using a different distributor. (*Id.*) East West asserts that this was the point in time at which it "lost all hope" that Defendants would honor the parties' agreements despite the assurances previously made by Rahman. (*Id.*)

B. <u>Procedural History</u>

On March 19, 2012, the parties to this action filed a Joint Discovery Plan. [Dkt. 25.] The deadline for serving all initial expert reports was set on May 17. All rebuttal reports were to be served by June 13. [Dkt. 26.] On April 4, Magistrate Judge Theresa Buchanan approved the parties' Joint Discovery Plan in this case. [Dkt. 36.] On June 5, Defendant filed a Motion to Extend Discovery Deadlines to File Expert Rebuttal Report. [Dkt. 71.] On June 6, Defendants filed their Opposition to Plaintiff's Motion for Extension of Time. [Dkt. 75.] On June 8, Magistrate Judge Buchanan granted Defendants Motion, setting the new deadline as June 27. Plaintiff was allowed to depose Defendants' expert until July 11. [Dkt. 83] On June 25, the parties entered a Joint Motion to Continue the Remaining Dates of Scheduling Order. [Dkt. 94.] On June 26, Magistrate Judge Buchanan entered an order granting the parties' Joint Motion to Continue. All dispositive and *Daubert* motions were to be filed by August 1, with responsive briefs due by August 15 and rebuttal briefs due by August 27. All Rule 26(a)(3) pretrial

7

disclosures were to be filed and served by September 4, with objections due by September 7. [Dkt. 96.] Magistrate Judge Buchanan also cautioned that there would be no more extensions of time.

On August 1, Defendants filed a Motion to Exclude the Testimony of Plaintiff's Damages Expert Michael Einhorn, Ph.D. [Dkt. 119.] On the same day, Defendants filed a Memorandum in Support of their Motion to Exclude the Testimony of Plaintiff's Damages Expert Michael Einhorn, Ph.D. [Dkt. 111.] They also filed a Motion to Seal Exhibits to Seal Exhibits to Declaration of Katie Bukrinsky in Support of Defendants' Motion to Exclude the Testimony of Plaintiff's Damages Expert Michael Einhorn, Ph.D. [Dkt. 109.] On August 15, Plaintiff filed their Opposition to Defendants' Motion to Exclude. [Dkt. 137.] On August 24, Plaintiff filed a Motion to Strike the August 16, 2012 "Supplemental" Expert Report of Defendants' Expert Jonathan A. Cunitz, D.B.A. [Dkt. 140.] They also filed a Memorandum in Support. [Dkt. 141.] On August 29, Defendants filed their Opposition to Plaintiff's Motion to Strike. [Dkt. 157.]

## II. Standard of Review

The imposition of discovery sanctions is reviewed for abuse of discretion. *See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 n. 10 (4th Cir.2002); *see also Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th

8

Cir.2001) ("[W]e give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1).").

### III. Analysis

In essence, Plaintiff takes issue with the timeliness and the manner of Defendants' production of expert reports in this case, as well as the content that Defendants' expert most recent report contains.

A. <u>Arguments of the Parties</u>

According to Plaintiff, Defendants produced less than 2,000 pages of discovery prior to the initial May 17, 2012 due date for expert reports. Plaintiff's Initial Expert Report on Damages ("Plaintiff's Initial Report") was served on the same day. Since that date, Defendants have produced an additional 31,000 pages of discovery. Consequently, Plaintiff served a Supplemental Expert Report on Damages ("Plaintiff's Supplemental Report") based upon the new production on July 27, 2012. The Plaintiff's Supplemental Report was filed eight days after Defendants' July 19, 2012 document production. Both Plaintiff's Initial Report and Plaintiff's Supplemental Report were written by Plaintiff's expert Dr. Michael Einhorn.

Defendants' First Expert Report ("Defendants' First Report") was served on June 27, 2012. On August 16, Defendants served a "Supplemental" Expert Report ("Defendants' 'Supplemental' Report"). Both reports were written by

9

Defendants' expert of Dr. Jonathan A. Cunitz, D.B.A. Service of Defendant's "Supplemental" Report took place more than two weeks after the due date for *Daubert* and dispositive motions.

Plaintiff argues that Defendant's "Supplemental" Report contains wholly new analysis and expert opinions that were absent from Defendant's Initial Report. Rather than having been based on information that recently became available to Defendants, Plaintiff asserts that Defendants' "Supplemental" Report is based upon information that Defendants' expert possessed and had reviewed by "at least June 27, 2012 – *i.e.*, nearly two months before Defendants' [Supplemental] Report was served." (Pl. Mem. 2.)

Plaintiff objects to the inclusion of this new information and believes that any argument by Defendants to characterize their "Supplemental" Report as merely supplemental in nature would be "disingenuous for at least two significant reasons." (*Id.*)

First, Plaintiff objects to the content of Defendants' "Supplemental" Report as including new material that was not present in Defendants' First Report. Plaintiff has itemized content from Defendants' "Supplemental" Report that was not present in Defendants' First Report and believes that "comparison of the two documents will readily show the differences between them." (*Id.*) As Defendants did not obey

the Scheduling Order by failing to disclose this information by June 27, 2012, Plaintiff believes that the Court should strike Defendants' "Supplemental" Report entirely. (*Id*. at 3.)

Additionally, Plaintiff objects to the manner in which Defendants' possession of the allegedly undisclosed information adversely affected discovery in this case. Plaintiff asserts that at some point prior to the June 27, 2012 service of Defendants' "Supplemental" Report, Dr. Cunitz reviewed and had access to the nearly 31,000 pages of documentary material that is the basis for the allegedly new information contained in the "Supplemental" Report. As a consequence, Plaintiff decries the disparity this created in discovery. "In other words, Plaintiff's Initial Report is based on about 6% of the pages eventually produced by Defendants' Supplemental Report is based on almost 93% of the pages eventually produced by Defendants. (*Id*. at 3-4)(emphasis in original). Plaintiff believes they had a right to serve Plaintiff's Supplemental Report after the additional information became available. Conversely, Plaintiff asserts that Defendants had no right to serve Defendants' "Supplemental" Report because "Defendants' expert had reviewed the information nearly two months ago and they made a tactical decision not to include the information in Defendants' rebuttal report." Plaintiff considers this a violation of their obligations under Fed. R. Civ. P. 26(a)(2)(B)(i). Plaintiff

11

further asserts that the access Dr. Cunitz had to Defendants to gather any additional information he needed for his report further compounded this this inequity. Consequently, Plaintiff believes should strike Defendants' "Supplemental" Report entirely under Rule 16(f).

In their Opposition, Defendants dispute Plaintiff's characterization of Defendants' "Supplemental" Report as a new report that contains substantially new material, accusing Plaintiff of the same behavior in filing Plaintiff's Supplemental Report that they now criticize. (Def. Opp. 2.) Defendants do not think such information may be rightly said to be "new" rather than "supplemental," and assert that their "Supplemental" Report was simply filed to rebut Plaintiff's Supplemental Report, and that Plaintiff was aware that Defendants would file such a rebuttal.

Similarly, regarding Plaintiff's contention that Defendants' "Supplemental" Report was untimely, Defendants accuse Plaintiff of engaging in substantively similar behavior with regard to untimeliness, stating "Plaintiff itself offered a supplemental report for its expert on July 27, 2012, more than two months after the parties agreed to serve initial expert reports." (*Id.*) Defendants further assert that the parties never agreed to a schedule as to supplemental reports. (*Id.*)

Defendants assert that, based upon the communications between the parties, that Plaintiff cannot be surprised by Defendants' "Supplemental" Report. To the extent that Plaintiff is surprised, Defendants assert that such surprise may be cured by deposing Dr. Cunitz. (Def. Opp. 8-9.) Defendant states that the analysis that Dr. Cunitz provides in his "Supplemental" Report directly rebuts Plaintiff's Supplemental Report and the damages calculations contained therein. (*Id*. at 10.) Defendant also assures the Court that their expert's opinions will not disrupt trial. (*Id*. at 9.)

B. Legal Framework

Rule 26(e)(2) of the Federal Rules of Civil Procedure provides that:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed.R.Civ.P. 26(e)(2). Rule 37(c)(1) pertains to failures to make disclosures or cooperate in discovery, and states that "[i]f a party fails to [timely] provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless." Fed.R.Civ.P. 37(c)(1). The court has "broad discretion" to determine whether an untimely disclosure is substantially justified or harmless. *See, e.g., S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). In determining whether to exclude untimely expert disclosures, courts are to consider five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Id*. Furthermore, the court has broad discretion to select the appropriate remedy in light of the totality of the circumstances. *Id*. at 595; Fed.R.Civ.P. 37(c)(1).

Plaintiff asserts that "[m]otions to strike expert reports for containing new material in this circuit are 'properly considered under Rule 16(f), not Rule 37(c)(1).'" (Pl. Mem. 7)(quoting *Luma Corp. v. Stryker.*, 226 F.R.D. 536, 541-42 (S.D. W. Va. 2005). Rule 16(f) pertains to sanctions and specifically speaks to noncompliance with a scheduling order or pretrial order. The section specific relevance to the instant Motion, Rule 16(f)(1)(c) reads:

> (1) In General. On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney: [...]

14

>             (c) fails to obey a scheduling or other
>             pretrial order.

Fed. R. Civ. P. 16(f)(1)(c). Among the remedies available to the Court is the option of striking the new material. In analyzing whether exclusion is an appropriate remedy, the Court should consider the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Luma Corp.*, 226 F.R.D. at 543-44 (citation omitted).

Defendants consider the practical difference between Rule 16(f) and Rule 37(c) to be largely semantic under the circumstances, although they assert that Rule 16(f) is inapplicable because, as there was no deadline for submitting supplemental reports, Defendants have not violated a scheduling order pursuant to Rule 16(f)(1)(c). (Def. Opp. 6 at n.1.) However, the test cited by the Defendants under *Southern States Rack & Fixture, Inc.*, 318 F. 597, for purposes of Rule 37(c) exclusion analysis, is a *verbatim* recitation of the test cited by the Plaintiff. Fed.R.Civ.P. 37(c)(1) states that when "a party fails to provide information or identify a witness as required by [Fed.R.Civ.P.] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on

a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1).

A party has a clear obligation to disclose and supplement expert witness information in a timely fashion, "[b]ut this duty does not permit a party to make an end-run around the normal timetable for conducting discovery." *Colony Apartments v. Abacus Project Mgmt., Inc.*, 197 Fed. App'x 217, 231 (4th Cir.2006). "Courts distinguish true supplementation (*e.g.*, correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by supplementing an expert report with a new and improved expert report." *Gallagher v. Southern Source Packaging, LLC*, 568 F.Supp.2d 624, 631 (E.D.N.C.2008). This court must first determine whether the defendant's supplemental disclosures were "true supplementation" rather than "gamesmanship and delay." *Id*.

If Defendants' supplemental disclosures were "true supplementation" then they may have been timely pursuant to Rule 26(a)(3). If, however, these disclosures were not "true supplementation" then the court has the discretion, as pursuant to Rule 37(c)(1), to exclude these disclosures. *See Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 695-96 (4th Cir.2003).

This Court finds that, despite Defendants' characterization of the instant report as supplementation, the document contains

16

new information and expert opinion, intended both as an expansion of their earlier expert report as well as a means to impermissibly broaden the scope of the expert opinions that Defendants seek to admit.  Given the new content of the report, it cannot be fairly said to be based solely upon the discovery of new information.  Consequently, the instant report cannot be considered "true supplementation."  The report is, considered in a most generous light, a new rebuttal to Dr. Einhorn's report, containing new information, new issues, and new expert analysis.  The Court considers the submission of such a report inappropriate at this late juncture, and the Court does not find particularly convincing the argument that the report is based upon newly discovered information.  This argument is even less compelling when the allegedly new information was produced by the Defendants themselves.  Defendants filed their initial expert report in late June and, to be sure, Defendants have already been granted one Motion for Extension of Time [Dkt. 83] to file a rebuttal expert report.  Defendants' "Supplemental" Report should have been served well before the exceedingly late date of August 16, 2012, and the Court has not been apprised of their justification for filing such material so close to the scheduled trial date.  Characterizing the instant report as "supplementation" does not give Defendants free reign to file expert reports, rebuttal or otherwise, until the last moment

before trial.  Although Defendants argue that the Court has allowed Plaintiff to file a supplemental report, Defendants did not file an objection to that report based upon untimeliness.

Having found Defendants' report to have been untimely, this Court will apply the five-fold factors in order to discern a remedy. Applying the first factor of the test promulgated in *Luma Corp*. and *Southern States*, this Court finds that there was indeed surprise to the Plaintiff, as the Defendants were already granted an earlier extension of time in which to file a rebuttal report, which entailed an accompanying deadline by which Defendants' expert should have been deposed.  Simply giving notice to Plaintiff that Defendants intend "produce a Supplemental Report" does not necessarily put the Plaintiff on notice that this report will contain new opinions and analysis of the sort that are contained in Defendants' "Supplemental" Report.  The mere fact that Defendants' First Report does not state all of the opinions it would now like to admit does not give them free reign to submit those opinions under the guise of supplementation, and it certainly does not mean that the Court must now admit them.  Applying the second factor, this Court finds that the solution that Defendants propose to cure the surprise is unacceptable.  This Court will not allow additional depositions or extensions of time.  It was Defendants' choice to file expert reports so perilously close to trial, having already

18

been the beneficiary of numerous time extensions related to discovery. The Court will not place itself or the parties in such a position so close to the scheduled trial date, and the court is unwilling to modify the trial calendar. As to the third *Luma Corp.* factor, the extent to which allowing the evidence would disrupt the trial, allowing this evidence would require, in order to avoid prejudice to the Plaintiff, the Court to reopen discovery in order to allow the Plaintiff to conduct additional deposition of Defendants' expert. This Court reiterates that it will not alter the trial schedule at this late juncture. Applying the fourth factor, the report at issue contains material that serves to rebut expert reports submitted on behalf of Plaintiff. Consequently, this Court ascribes to the evidence a significant degree of importance to the instant action. Applying the fifth factor, the Defendants have not provided an explanation for their failure to disclose the instant report. To be sure, they have argued that supplemental reports were not subject to any deadline. The mere fact that supplemental reports were not subject to any express deadline does not imply that the parties must be allowed to file expert reports at any time prior to the very day of trial simply by characterizing such reports as supplemental. Regardless, Defendants' "Supplemental" Report does not qualify as true "supplementation." Consequently, the Court has not been

apprised of Defendants' explanation for filing their expert report so close to the scheduled trial date in this case. Considering the five-fold factors *in toto*, this Court is left with no other choice but to strike Defendants' "Supplemental" Report.

## IV. Conclusion

For the foregoing reasons, this Court will grant Plaintiff's Motion to Strike the "Supplemental" Expert Report of Jonathan A. Cunitz, D.B.A.

An appropriate Order will issue.

|  |  |
|---|---|
| September 17, 2012 | /s/ |
| Alexandria, Virginia | James C. Cacheris |
|  | UNITED STATES DISTRICT COURT JUDGE |